**WESTERN UNION INTERNATIONAL, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

American Telephone and Telegraph Company, TRT Telecommunications Corporation, RCA Global Communications, Inc., ITT World Communications, Inc., Intervenors.

Nos. 80–1286, 80–1287 and 80–1310.

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1981.

Decided March 23, 1982.

H. Richard Schumacher, New York City, with whom Donald J. Mulvihill, and Susan P. Serota, Washington, D.C., were on the brief, for RCA Global Communications, Inc., petitioner in No. 80–1310 and intervenor in No. 80–1287.

Lawrence W. Secrest, III, Washington, D.C., with whom Danny E. Adams, Robert Michelson, Robert E. Conn, and John M. Scorce, Washington, D.C., were on the brief, for Western Union International, Inc., petitioner in Nos. 80–1286 and 80–1287.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Robert R. Bruce, General Counsel, David J. Saylor, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Jane E. Mago, Counsel, F.C.C., and Barry M. Grossman, John J. Powers, III, and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

J. Richard Devlin, Long Valley, N.J., with whom Robert E. Boone, Jr., Bedminster, N.J., Burton K. Katkin, and Gerald E. Murray, New York City, were on the brief, for American Telephone and Telegraph Co., intervenor in Nos. 80–1286, 80–1287, and 80–1310.

Lloyd D. Young, Washington, D.C., entered an appearance for TRT Telecommunications Corp., intervenor in Nos. 80–1286, 80–1287, and 80–1310.

John A. Ligon, New York City, entered an appearance for ITT World Communications, Inc., intervenor in Nos. 80–1287 and 80–1310.

Before SWYGERT *, Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit; ROBB and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Two related Federal Communications Commission (FCC) orders are before us for review on the petitions of two of the four dominant international record carriers (IRCs), Western Union International, Inc. (WUI), and RCA Global Communications, Inc. (RCA).[1] The first of these orders (the *Dataphone* order)[2] removes the "voice-only" restriction the FCC had placed on international telephone facilities, thereby permitting American Telephone and Telegraph Co. (AT&T) to allow customers to use the international telephone network for data transmissions. *American Telephone and Telegraph Co.*, 75 F.C.C.2d 682 (1980). The second order (the *Datel* order) permits users of the IRCs' Datel service to make voice calls on the IRCs' primarily record service networks. *Western Union International, Inc.*, 76 F.C.C.2d 166 (1980).

Formerly, the FCC had distinguished, with limited flexibility, between overseas voice and record transmissions. In general, Commission policy reserved voice communications to AT&T and record communications to the IRCs.[3] The FCC now acknowl-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The other principal IRCs are ITT World Communications, Inc. and TRT Telecommunications Corp. Neither has submitted briefs in this court, but ITT has filed a statement concurring in the position of WUI. WUI is not affiliated with the Western Union Telegraph Co.

2. Throughout this opinion, we shall use the term "dataphone" in its generic sense to refer to the process of transmission of data or hard copy communication by means of appropriate

equipment over telephone lines at regular message rates. This usage should not be confused with the term "Dataphone," a registered trademark belonging to American Telephone and Telegraph Co. (AT&T). The present controversy does not concern AT&T's data communication services and equipment encompassed by that trademark.

3. This distinction rested upon both technological and economic considerations. First, until recently there were important physical and engineering differences between telegraphy and

edges that the traditional distinction between voice and record services has lost much of its technical significance and may not, at this time, serve the public interest. Messages, in many instances, no longer lend themselves to ready compartmentalization and identical facilities and technologies may carry either or both kinds of messages. Without yet abandoning the voice-record dichotomy, the Commission, in these complementary orders, took a step in that direction.[4]

WUI does not object to the underlying authorization granted by the two orders. However, it urges that the FCC should have granted in full, not merely in part on an interim basis, the IRCs' requests for interconnection with AT&T's domestic network. Pending a full, final solution to the interconnection issue, WUI maintains, the FCC should defer authorizing AT&T's entry into the overseas record transmission market. RCA, while it joins WUI in seeking "full" interconnection for the IRCs, argues that in no event should the giant AT&T be permitted to use its facilities to provide non-voice services overseas.

We affirm both orders as a reasoned response by the Commission to a current public need for service at affordable rates. In so ruling, we hold that the FCC permissibly deferred a more comprehensive solution to the interconnection issue, given the complex nature of that issue, the costs involved, and the desirability of a coordinated plan attending to the needs of domestic as well as international carriers.

## I.

The *Datel* order, to the extent that it grants the application of the IRCs for removal of voice restrictions on their Datel service, is not contested on review. We therefore turn to the question whether the *Dataphone* order reflects a proper exercise of the FCC's authority to make communications policy in the public interest and of the Commission's responsibility to promote adequate service at reasonable charges. *See* 47 U.S.C. § 151.

Initially, we point out that, despite the tariff restriction in force prior to the *Dataphone* order, many users of AT&T's overseas telephone service in fact transmitted record data abroad. The telephone network does not distinguish between a dataphone call and an ordinary voice call. Thus the tariff restriction was virtually unenforceable in the absence of extensive monitoring which the telephone companies did not undertake and the FCC did not require. *See* 75 F.C.C.2d at 696 n.11.

Next, we note that AT&T had provided record transmission service domestically for many years at the time of the *Dataphone* order. The necessary facilities were in place to offer the service overseas without additional investment or costs. The order merely permits AT&T to offer "basic" dataphone service by removing an artificial re-

telephony. Second, this policy served to protect the new and relatively weak IRCs from potentially ruinous competition from the giant AT&T. *See American Tel. & Tel. Co.* (*TAT-4*), 37 F.C.C. 1151, 1157-62 (1964); *American Tel. & Tel. Co.*, 27 F.C.C. 113, 120-23 (1959).

Prior to the orders before us, the Commission recognized two exceptions to its general rule. It permitted both AT&T and the IRCs to transmit voice and record communications from the United States mainland to Hawaii. This exception was recognized in 1955 because of the needs of national defense. *See Hawaiian Tel. Co. v. FCC*, 498 F.2d 771, 773 (D.C.Cir.1974). In addition, the Commission permitted the IRCs, but not AT&T, to utilize certain international circuits for alternate voice-record communication. The IRCs, however, were permitted to transmit voice message over these circuits only for the purpose of establishing con-

tact for data transmission. *See TAT-4, supra,* 37 F.C.C. at 1160-61.

4. In 1976, the Commission voted to permit the filing of applications from both AT&T and the IRCs to provide overseas dataphone services. The IRCs challenged this decision, but their petitions were rejected as premature. *ITT World Communications, Inc. v. FCC*, 555 F.2d 1125 (2d Cir. 1977).

More recently, the Commission has announced plans to eliminate the voice-record distinction in overseas communications altogether. Notice of Proposed Rulemaking, Overseas Communications Services, 45 Fed.Reg. 76498 (Nov. 19, 1980). The period for submission of comments on this proposal expired on October 28, 1981. 46 Fed.Reg. 50568 (Oct. 14, 1981).

straint; it does not authorize AT&T to re-arrange or enhance its facilities to make them more adaptable to data transmission. While AT&T is now positioned to compete with the IRCs in offering basic dataphone service, the order does not open overseas record services generally to AT&T, and thus does not equip AT&T to match the IRCs in offering more specialized, sophisticated service.

The FCC, determining the public interest, stressed that AT&T could satisfy the dataphone needs of many small users at rates equivalent to ordinary telephone rates, that domestic dataphone users could take advantage of this "permissive use" [5] of the overseas network immediately without buying more equipment or service, and that grant of AT&T's application would permit a more efficient use of telephone company and customer facilities. 75 F.C.C.2d at 693–94. We find these determinations unassailable. Nor do the IRCs challenge them. But in face of the gains in efficiency and enhanced customer service the *Dataphone* order secures, RCA insists that AT&T must be kept out of the overseas record transmission business to assure that the IRCs will not be overwhelmed by AT&T's vast marketing powers.

RCA complains that the FCC failed to appreciate that the IRCs were fully able and willing to offer basic dataphone service, therefore authorization of AT&T's entry was not required to satisfy any public need. But the Commission observes that the ability and willingness of existing carriers to provide a service is not sufficient reason to exclude a new entrant,[6] and suggests that the IRCs' effort to defeat AT&T's application confounds the public interest with the IRCs' "private interest in preserving their comfortable international market positions." Brief for Respondents at 48.[7]

The FCC points to several indicia of the IRCs' comfortable situation. The Commission notes a staff audit of the IRCs' operations that suggested excessive rates of return, particularly for international Telex service. *Preliminary Audit and Study of Operations of International Carriers and Their Communications Services (Audit)*, 75 F.C.C.2d 726 (1980), *petition for review docketed sub nom. Western Union Telegraph Co. v. FCC*, No. 80–1133 (D.C.Cir. Jan. 30, 1980). Nor does it appear that the IRCs vigorously compete among themselves as to rates and service innovations. *See*

---

**5.** A permissive or ancillary use is possible but not required for optimal utilization of equipment. Customers may use their telephone equipment "in whatever way they find operationally acceptable, but the carriers may not build facilities which are designed to be most efficiently used to carry the 'ancillary' service." *Datel*, 76 F.C.C.2d at 179–80. In its *Dataphone* order, the Commission explained that

we are not authorizing AT&T to invest any capital or engage in any rearrangements of its facilities for the purpose of enhancing the utility or capability of its [long-distance] telephone network for the provision of nonvoice services. Nor are we authorizing AT&T to provide international private line data services.

75 F.C.C.2d at 694–95 (footnotes omitted).

**6.** *See, e.g., ITT World Communications, Inc. v. FCC*, 595 F.2d 897, 903–04 (2d Cir. 1979) (FCC may allow new IRCs to carry specialized communications notwithstanding the capacity of existing IRCs to offer same service, but agency must impose time limits within which new entrants must begin operation); *MCI Telecommunications Corp. v. FCC*, 561 F.2d 365, 379–80 (D.C.Cir.1977) (FCC may not exclude new entrants from domestic long-distance telephone

service merely because AT&T enjoys de facto monopoly), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790, *mandate enforced*, 580 F.2d 590 (D.C.Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978); *ITT World Communications, Inc. v. FCC*, 555 F.2d 1125, 1127 (2d Cir. 1977) (ability of IRCs to provide international dataphone service does not preclude FCC from accepting application from AT&T to enter this field, where there is undisputed need for such service). *See also United States v. Dixie Highway Express, Inc.*, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967) (per curiam) (Interstate Commerce Commission need not permit existing motor carriers to satisfy need for additional services before awarding certificate of public convenience and necessity to new entrant).

**7.** FCC Chairman Ferris, discussing the orders under review here and six related Commission decisions taken at the same time, *see* note 9 *infra*, observed: "The [IRCs] should be aware that the easy, and profitable, life inside the cartel is over." 75 F.C.C.2d at 701 (separate statement).

*Preliminary Audit and Study of Operations of International Carriers,* 59 F.C.C.2d 240, 248 (1976) (Separate Statement of Commissioner Washburn). In the *Dataphone* order, the FCC observed it was "certainly possible" that a reduction in Telex rates to a level closer to AT&T's MTS (and dataphone) rates might "sharply curtail" the dataphone use of MTS. 75 F.C.C.2d at 697 n.12.[8] The Commission further expected that its *Dataphone* order would "result in enhanced competition in the international record · service market," a development which "would tend to stimulate the IRCs (and other competing carriers) to innovate and provide services efficiently at cost-based rates in order to compete effectively." *Id.* at 695–96.

The IRCs, it seems clear, are no longer an infant industry in special need of extraordinary government protection. Through the *Datel* order and related decisions,[9] the FCC strengthened the position of the IRCs by securing to them expanded domestic operation centers and enhanced voice capacity. 76 F.C.C.2d at 180–84. We find entirely reasonable the FCC's forecast that AT&T's entry, "on a 'permissive use' basis and without offering dataphone as a discrete service, would enhance competition in overseas record markets by stimulating the IRCs to make their services more efficient and useful and less costly." Brief for Respondents at 29A. *See Dataphone,* 75 F.C.C.2d at 695–96. And we cannot gainsay the Commission's conclusion that the public interest factors supporting AT&T's limited entry "outweighed any loss of traffic and revenues by the IRCs," or the FCC's expectation that the IRCs will "be able to compete effectively in any event." Brief for Respondents at 29A.

In sum, we hold that the FCC, in authorizing both AT&T and the IRCs to provide dataphone-type services, appropriately advanced the public interest by permitting cost effective use of existing facilities to fill a demonstrated need promptly. We therefore turn to the question pressed most anxiously by the IRCs, whether AT&T's entry should be attended by an immediate, comprehensive order on the "full" interconnection sought by the IRCs.

## II.

The IRCs demand interconnection of the kind currently "enjoyed between Bell operating companies and the AT&T Long Lines Department." *Dataphone,* 75 F.C.C. 2d at 686. The FCC, uncertain at this stage whether the cost of "full" interconnection is "necessary or desirable in the public interest," 47 U.S.C. § 201(a), has required, as an interim measure, interconnection at the same level as that AT&T provides to domestic common carriers offering ordinary telephone service in competition with AT&T. 75 F.C.C.2d at 698–99. The Commission has retained jurisdiction "to further condition [AT&T's] authorization" on provision to the IRCs of "additional, or different, kinds of interconnection." *Id.* at 699.

We agree that it would disserve the public interest to delay AT&T's overseas dataphone service pending a more complete resolution of the IRCs' interconnection demand. As the Commission emphasizes, it is far from clear that the IRCs' Datel revenue is adequate to justify the costs of achieving the parity interconnection the IRCs seek. *See Datel,* 76 F.C.C.2d at 185. Further, it is not clear that the IRCs are willing or able to pay for "full" interconnection or, if they are not, whether the public benefit involved warrants ultimate imposition of the cost on telephone ratepayers generally. Nor is it apparent why the IRCs' interconnection

---

8. The term "message telecommunications service" (MTS) refers to the long-distance telephone transmission system. *See American Tel. & Tel. Co.,* 15 F.C.C.2d 605, 606 (1968).

9. *See International Record Carriers' Scope of Operations (Gateways),* 76 F.C.C.2d 115 (1980); *Interface of the International Telex Service (Interconnection),* 76 F.C.C.2d 61 (1980); *ITT World Communications, Inc. v. Consortium*

*Communications Int'l, Inc.,* 76 F.C.C.2d 15 (1980); *Preliminary Audit and Study of Operations of International Carriers and Their Communications Services (Audit),* 75 F.C.C.2d 726 (1980); *Western Union Tel. Co.,* 75 F.C.C.2d 461 (1980); *Regulatory Policies Concerning the Provision of Domestic Public Message Services (PMS),* 75 F.C.C.2d 345 (1980).

problems should take precedence over the similar problems of carriers competing with AT&T in the domestic market. *See Dataphone,* 75 F.C.C.2d at 697–98.

We deferred decision of these petitions pending reports from the FCC on the course of discussions among the parties, under Commission auspices, to resolve the interconnection issue for the short and long run. The reports indicate only modest progress toward sensible accommodation of the interests at stake.[10] In view of the FCC's continuing oversight and of its retention of jurisdiction to proceed more formally if settlement efforts prove unavailing, we conclude that court intervention is not warranted at this time.

In sum, we hold that the FCC reasonably determined that the orders in question serve the public interest and should not be held hostage to full settlement of the IRCs' interconnection request. Accordingly, the Commission's decisions are

*Affirmed.*

---

**10.** On January 11, 1982, AT&T and two large IRCs, RCA and ITT, entered into an agreement concerning short-term interconnection arrangements. *See* Response of Intervenor AT&T to Comments of Petitioner WUI on Second Supplement to Report to the Court, Attachment A.

