NEIGHBORHOOD TV COMPANY,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Microband Corporation of America, SIN,
Inc., Spanish International Communi-
cations Corporation, National Associa-
tion of Public Television Stations, Inter-
national Broadcasting Network, Inter-
venors.

LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

International Broadcasting
Network, Intervenor.

Nos. 83–1635, 83–1736.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 27, 1984.
Decided Aug. 17, 1984.

Alan R. Plutzik, Washington, D.C., for petitioner Neighborhood TV Company, Inc. in No. 83–1635. Sol Schildhause, Washington, D.C., also entered an appearance for Neighborhood TV Company, Inc.

John D. Lane, Washington, D.C., with whom Martin J. Gaynes and Ramsey L. Woodworth, Washington, D.C., were on the brief for petitioner Los Angeles County Sheriff's Department in No. 83–1736.

Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., J. Paul McGrath, Asst. Atty. Gen., Barry Grossman and Nancy C. Garrison, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. C. Grey Pash, Jr., Atty., F.C.C. and Andrea Limmer, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Norman P. Leventhal, Washington, D.C., was on the brief for intervenor SIN, Inc. in No. 83–1635. Barbara K. Kline and Meredith S. Senter, Jr., Washington, D.C., also entered appearances for SIN, Inc.

Paul James Broyles, Houston, Tex., entered an appearance for intervenor International Broadcasting Network in Nos. 83–1635 and 83–1736.

Stephen R. Bell and Paul J. Sinderbrand, Washington, D.C., entered appearances for intervenor Microband Corp. of America in No. 83–1635.

Norman P. Leventhal and Barbara K. Kline, Washington, D.C., entered appearances for intervenor Spanish Intern. Communications Corp. in No. 83–1635.

Peter Tannenwald, Theodore D. Frank and Vonya B. McCann, Washington, D.C.,

entered appearances for intervenor National Association of Public Television Stations in No. 83–1635.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and EDMUND L. PALMIERI,[*] Senior United States District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Neighborhood TV Co., Inc. (Neighborhood) and the Los Angeles County Sheriff's Department (Sheriff) petition for review of a Federal Communications Commission (FCC or Commission) order establishing a low power television service, the FCC's subsequent denial of reconsideration of that order and several interlocutory decisions affirmed and adopted in the final order. Neighborhood essentially takes issue with the interim procedures for processing television translator license applications that the FCC adopted during the pendency of its inquiry into the authorization of low power television on frequencies previously allotted to the television translator service. The Sheriff objects to the FCC's decision authorizing low power television service on frequencies for television translators shared with private land mobile/public safety radio service. We find no infirmity in either the FCC's interim processing procedures for television translator applications, or with its allocation of channels to low power television. Accordingly, we affirm the FCC decisions.

## I. BACKGROUND

A. *Television Translators and Low Power Television Prior to the FCC's Proposed Low Power Television Rules*

Television translators are devices that receive conventional broadcast television signals, amplify them and rebroadcast them at another frequency. Originally translators were to serve areas of the country where geographical isolation or rough terrain prevented adequate reception of conventional broadcasts. Translator stations operated only on UHF channels at much lower power than full service (conventional) television stations. *See* 47 C.F.R. § 74.735. They were forbidden to originate programming, to otherwise alter their input signal, or to obtain revenue through subscription fees or advertising. These restrictions stemmed, in large part, from the technical inability of small low power stations to broadcast a high quality original signal. *See In the Matter of Amendment of the Rules Governing Television Translator Stations*, 13 F.C.C.2d 305, 322 (1968).

The rulemaking in controversy here was instigated to allow stations operating at the same low power and in the same band of the spectrum as translators to originate programming. Thus the term "low power television" in communications parlance means low power broadcasting of original programming, rather than low power rebroadcasting of full service television programs received off the air. But although translator service and low power television are thus distinct in at least one important respect, they have not historically been treated as entirely distinct by the FCC. Prior to this rulemaking, the FCC had allowed limited original broadcasting by translators for acknowledgments, advertising, solicitation of funds and emergency announcements, as well as rebroadcast of microwave signals and of taped programs. *See generally In the Matter of An Inquiry Into the Future Role of Low-Power Television Broadcasting and Television Translators in the National Telecommunications System*, 68 F.C.C.2d 1525, 1547–49 (1978) (Notice of Inquiry, Appendix B).[1] Thus "[n]umerous actions that [the FCC

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. · Unless otherwise noted, all cited FCC notices and orders and comments by parties were issued or submitted as part of the Commission's Inquiry Into the Future Role of Low-Power Television Broadcasting and Television Translators in the National Telecommunications System, BC Docket No. 78–253.

has] taken over the past ... years have significantly blurred the distinction between traditional translators and those exhibiting the attributes of low power stations." *Memorandum Opinion and Order,* 84 F.C.C.2d 713, 723 (1981).

In 1978, the FCC issued its Notice of Inquiry, to develop a "coherent long-range plan for the use of TV translator stations with traditional and, perhaps, altered functions, and, more generally, for the use of low-power, origination-capable television stations." *Notice of Inquiry,* 68 F.C.C.2d at 1525. The Commission noted that technological advances made low power television feasible, and that this evolution was reflected in its prior case-by-case loosening of translator station limitations. In the Notice of Inquiry the Commission announced its intention to replace such *ad hoc* development of low power television with a long-range policy. *Id.* at 1527.

### B. *The Low Power Television Rulemaking—"Interim Processing"*

On October 17, 1980, the FCC issued a *Notice of Proposed Rulemaking,* 82 F.C.C.2d 47 (1980). In addition to proposing a new service allowing low power broadcasting of original programming, the FCC's notice included a statement of procedures the Commission would use to process translator applications prior to promulgation of final rules to cover this new low power television service. *See id.* at 78; *see also Public Notice of Interim Processing Procedures,* 48 Rad.Reg.2d (P & F) ¶¶ 53:3572, 54:732 at 291 (1980) (public notice of the interim processing procedures for conventional TV translator applications adopted three days earlier). Because the proposed low power television service was to be "buil[t] upon the existing translator service," *Notice of Proposed Rulemaking,* 82 F.C.C.2d at 48, the FCC addressed the policy it intended to follow regarding translator applications. It rejected a "freeze" on translator applications because "the routine uncontested translator application should continue to be processed." *Id.* at

78. It also invited applications that proposed low power (origination) features conforming to the proposed rules' technical standards and ownership requirements where those applications otherwise met the requirements for a translator license and offered a public interest justification for waiver of the "no origination" rule. *Id.* But, it noted that all licenses granted prior to promulgation of final low power television rules would be subject to those final rules eventually adopted. Finally, to preserve the status quo and to avoid allowing translator applicants to gain a lock on frequencies prior to approval of final low power television rules, the FCC decided that "no mutually exclusive applications [whether asking for waiver of the "no-origination" rule or not] can be processed through to a grant during the pendency of [the low power television] proceeding." *Id.* In essence, the interim processing regime was designed to achieve three things: it allowed applicants to file for translator licenses authorizing original programming by requesting a waiver of the no-origination rule; it subjected contested traditional translator applications to a processing freeze pending the outcome of its rulemaking; and it conditioned all interim license grants on the final low power television rules.

Numerous parties, including Neighborhood, petitioned the FCC for reconsideration, clarification or modification of the interim processing procedures. Neighborhood, hoping to set up an alternative national television network of translator stations rebroadcasting signals sent from a central location by satellite transmission, had filed numerous translator applications. In this court, it objects to the FCC's interim processing as subjecting its applications to competition with low power television applications that did not conform to preexisting translator application requirements. Nonetheless at this stage of the proceeding before the Commission, Neighborhood apparently merely responded to other petitioners' comments asking the FCC to establish

multiple cutoff lists [2] for processing translator applications with or without origination waivers. *See Memorandum Opinion and Order*, 48 Rad.Reg. ¶¶ 53:3572, 54.732, at 1201 (1981). Other parties, however, raised the principal argument that Neighborhood now relies on before this court: that the FCC's interim procedures amounted to a premature inauguration of the low power television service. *Id.* at 1199. The Commission, in response, explained that none of the alternatives suggested by the petitioner parties comported as well with the public interest as its own regulation. *Id.* at 1204. But, mindful of the petitioning parties' concerns that interim processing might "foster permanent situations that have not been fully examined through rulemaking," it limited to 15 the number of translator stations it would grant to any one party prior to promulgation of final rules. *Id.* at 1211.

Following its announcement of its interim processing procedures, the FCC was swamped with translator applications. On April 9, 1981, the Commission noted that as of March 25 of that year, 3,646 translator applications had been filed and the agency estimated that about 1,000 additional applications were filed by March 31. *See Memorandum Opinion and Order*, 46 Fed. Reg. 26,063 (1981). Many of these applications requested waiver from the no-origination rule. *Id.* Due to this steadily mounting backlog of translator applications, the FCC, in its Memorandum and Order of April 9, 1981, imposed a freeze on future filing of translator applications. The Memorandum Opinion and Order provided limited exemptions to the freeze. The freeze remained in effect, without change, until

the FCC adopted final regulations governing low power television.

After the final low power television rules were adopted, a considerable backlog in processing translator applications still existed. Thus, in its order denying reconsideration of the final rules the FCC maintained the freeze, but implemented a tiered system for processing applications, which replaced its traditional "first filed, first considered" policy. The FCC previously had exempted applicants planning to serve areas which did not receive at least two full service television stations from the filing freeze. This freeze exemption, it now said, "strain[ed Commission] resources and delay[ed] authorizations because it required an individual engineering judgment [as to whether an area fell within the broadcast range of two television stations] for each application claiming this exemption." *See Denial of Reconsideration of Low Power Television Rules*, 48 Fed.Reg. 21483 (1983). Under the new system the filing freeze remained in effect except for applications "proposing to locate their transmitting antennas more than 55 miles from any of the 212 FCC-ranked television markets." 48 Fed.Reg. 21483 (1983).[3] *Id.* The Commission, however, continued to process applications filed and placed on cutoff lists before the freeze, and also exempted applications mutually exclusive with those already on the cutoff lists from the filing freeze. *Id.* at 21483 & n. 13.

## C. *The Low Power Television Rule—Allocation of Frequencies*

The proposed low power television service was to operate on UHF channels 14–69, channels already available for use by full service television stations as well as

---

**2.** A cutoff list is:

> a Public Notice listing applications which have been accepted for filing and announcing a date (not less than 30 days after issuance) on which the listed applications will be considered available and ready for processing and by which all mutually exclusive applications and petitions to deny the listed applications must be filed.

47 C.F.R. § 73.3572(c). If a mutually exclusive application is timely filed, it is considered along

with the application on the cutoff list with which it competes. 47 C.F.R. § 73.3572(d). Thus the list puts potentially competing applicants on notice that a license for broadcasts on the frequency in which they are interested may be granted, and guarantees them a chance to compete for that license.

**3.** Such applications serving rural areas were put in tier I, which was exempt from the filing freeze. 48 Fed.Reg. 21483 (1983).

translators. Channels 14–20, however, are also available for the land mobile radio service. Fearing that the low power television would attract a large number of applicants on these shared channels, various segments of the land mobile community, including those using these channels for public safety purposes, requested that the Commission not allocate low power television on channels 14–20. *See* Comments of the Sheriff of Los Angeles County, Joint Appendix (J.A.) at 73–77 (filed Jan. 14, 1981). During the low power television rulemaking, the Sheriff also filed a rulemaking petition asking the Commission to allocate channels 14–20 solely to the land mobile radio service. *See Final Rule,* 47 Fed.Reg. 21479 (1982) (noting Sheriff's petition for rulemaking).

The Commission noted that there was a strong possibility that international communications agreements would allow it to authorize the sharing of UHF channels 21 through 69 with the land mobile radio service. *See Final Rule,* 47 Fed.Reg. 21479 (1982). It stated its intention to study the feasibility of sharing that additional spectrum band. In addition the FCC ordered that all low power television operations on UHF channels 14 through 20 were to be secondary to existing land mobile radio stations on these channels. To the extent any interference between the two occurs, the low power broadcasts have the obligation to correct the interference or cease operation. In addition to these safeguards, the Commission put all low power television applicants on notice that licenses for channels 14 through 20 were being issued subject to revocation if the Commission subsequently decided to adopt the Sheriff's proposed rule. *Denial of Reconsideration,* 48 Fed.Reg. 21480 (1983). *Id.* With the distinct possibility of an expanded spectrum in mind, and the safeguard that land mobile applicants would enjoy priority over channels 14 through 20, the Commission concluded that it was not in the public interest

to delay the power television rulemaking until a final determination on the Sheriff's request that channels 14–20 be reserved exclusively for land mobile radio broadcasts. *Id.* at 21,480.

## II. Neighborhood's Claims

### A. *Neighborhood's Objections to the Interim Processing Procedure*

Early in 1980, Neighborhood formulated a plan to establish a new nationwide advertiser supported television network using translator stations and satellite interconnection. The plan called for translator stations in large television markets to rebroadcast the signal of an Arizona full service television station which they were to receive via satellite. Neighborhood expected that, since its translator applications did not ask for authority to originate signals locally, the applications would be routinely processed. *See* Brief for Petitioner Neighborhood at 5. Neighborhood thus prepared and filed 141 translator applications between September 2 and November 13, 1980. *Id.* at 5–6.

The FCC first published its interim processing procedures on September 12, 1980, after Neighborhood began filing its translator applications.[4] *See Public Notice of Interim Processing Procedures,* 48 Rad. Reg.2d at 291 (1980). Pursuant to these procedures, the Commission consigned Neighborhood's applications to the "interim" category. Neighborhood's fundamental objection to this consignment is that it subjected Neighborhood's applications to competition with applications seeking authority to broadcast original programming on translator stations. Neighborhood complains that "[w]ere it not for 'interim processing' [most of its] filings ... would have been unopposed and would have been immediately grantable." Brief for Petitioner Neighborhood at 8. Instead, Neighborhood's applications were subject to the FCC

---

**4.** The interim processing procedures were not published in the Federal Register, however, until October 17, 1980, when the FCC published the notice of proposed rulemaking for low pow-

er television which it had adopted on September 9, 1980. *See Notice of Proposed Rulemaking,* 45 Fed.Reg. 69, 190 (1980), *reprinted in* 82 F.C.C.2d at 47.

policy not to process opposed applications, and hence were considered only after adoption of the final low power television rules, and at that time they had to compete against what Neighborhood characterizes as "large numbers of [low power television] applications that were not in harmony with the [translator] rules when they were filed." *Id.* at 8.

Neighborhood also objects to the 15 station limit on the applications that the FCC would process through to grant during the interim period prior to promulgation of final low power television regulations. Fearing that authorizing more than 15 licenses for a single applicant during the interim period might result in concentration of ownership that could contravene the final low power television regulations, the FCC required applicants with greater than 15 applications on file to inform the Commission which 15 applications they wished the Commission to process during the interim period.[5]

Finally, Neighborhood attacks the FCC's decision to adopt a tiered system for ordering the processing of translator applications. Neighborhood's applications were generally for licenses in major urban markets, and it claims that the tiered system, by processing applicants for stations serving rural areas first, further delayed processing of its applications, causing Neighborhood's applications to compete with a still greater number of mutually exclusive low power television applications.

Neighborhood attacks these aspects of the FCC's interim processing procedures on three grounds: first that the Commission failed to follow its own rules; second that the Commission violated the Administrative Procedure Act, 5 U.S.C. § 553, by adopting rules without prior notice and comment; and third that the FCC acted arbitrarily and capriciously in adopting its interim processing procedures. We consider these arguments in turn.

### B. FCC Compliance With Its Own Regulations

Neighborhood argues that by accepting for filing translator license applications asking for program origination authority, the FCC violated its own regulations prohibiting acceptance of nonconforming applications for licenses. *See* 47 C.F.R. § 73.-3566. The FCC has consistently maintained, however, that it accepted applications under its long-standing policy allowing it to waive license requirements for applicants who show waiver is in the public interest.[6] Neighborhood counters that the FCC cannot properly rely on a traditional policy liberally allowing waivers to justify accepting such applications, since many applications did not meet the Commission's general standards for waiver. *See* Supplemental Brief for Petitioner Neighborhood at 2 (arguing that applicants eventually licensed to operate low power television stations for which Neighborhood had com-

---

**5.** It is not clear how this 15 station limit applied to Neighborhood, if at all. For example, despite questioning Neighborhood on this precise point at argument, we still do not know whether Neighborhood ever had to elect 15 applications it wanted processed. While Neighborhood had 141 translator applications on file, according to the FCC it did not have 15 unopposed applications on file. Therefore, the 15 application limit only would have affected Neighborhood if the FCC applied this limit prior to freezing processing of opposed applications. The parties' brief and arguments, and the FCC decisions are all silent on precisely how the 15 application limit worked.

**6.** In the FCC's first announcement of its interim processing procedures, the Commission clearly stated:

> because there are no rules for low power stations, it is necessary for each applicant, separately and individually, to establish the public interest justification for an interim grant. The first step is to prepare a complete and sufficient [translator] application .... The second step is *to describe exactly the waivers being sought and the public interest justification therefor.*

*Public Notice,* 48 Rad.Reg.2d at 293 (emphasis supplied). At no time prior to adoption of its final low power television rule did the Commission publish any statement relieving applicants of their requirement to show a public interest for all waiver of translator rules.

peted had not made the sort of particularized showing in support of waiver of rules that would merit Commission consideration of their applications).

Neighborhood, however, apparently misconceives the nature of our inquiry upon review of a rulemaking proceeding. We cannot here evaluate whether *in particular instances* the Commission failed to apply its rules since, in reviewing the low power television rulemaking, we do not have the record of those particular licensing proceedings before us. While Neighborhood refers us to particular applications it believes did not justify a waiver of the no origination rule, without these particular applications before us, and in the absence of any proffered rationale by the Commission explaining its acceptance of these particular applications, we are in no position to evaluate whether the Commission failed to follow its established waiver practices.

▇▇▇ A determination of whether the FCC consistently applied its waiver doctrine in accepting particular translator applications is not easily made. Where, as here, the rule governs information that the agency requires before it will consider a filing by one it regulates, courts have been especially apt to allow agencies much leeway in granting waivers to their own rules. There is a "general principle that '[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business when in a given case the ends of justice require it." *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (quoting *National Labor Relations Board v. Monsanto Chemical Co.*, 205 F.2d 763, 764 (8th Cir.1953)); *see also Health Systems Agency v. Norman*, 589 F.2d 486 (10th Cir.1978) (court found HEW abused its discretion by

refusing to waive a filing deadline where application was 55 minutes late for justifiable reasons); *Lyman v. United States*, 500 F.2d 1394, 1396 (Temp.Emer.Ct. of App.1974) (excusing Price Commission failure to get comments from a local agency as required by its rules). "Whether or not [a Commission's] discretion has been soundly exercised will, of course, *depend on the circumstances of the case* as reviewed by the Commission." *Municipal Electric Utility Association v. Federal Power Commission*, 485 F.2d 967 (D.C.Cir.1973) (emphasis supplied). In separate proceedings, Neighborhood apparently has challenged the grant of low power licenses to applicants with which it competed on the ground that the successful applications were improperly accepted for filing. *See* Supplemental Brief for Petitioner Neighborhood at 2 & n. 2. We thus believe Neighborhood's argument that the FCC failed to follow its rules and its established waiver policy are properly raised in those challenges, rather than in its general challenge to the interim processing procedures.[7]

C. *FCC Compliance With Rulemaking Procedures*

Neighborhood attacks interim processing, claiming that the FCC violated the Administrative Procedure Act (APA) notice and comment rulemaking requirements when the Commission adopted such processing procedures. Since we have already noted that the propriety of the FCC's waiver of the no origination rule for particular applications is not properly before us in this case, we focus here on the FCC's adoption of interim processing procedures other than such waivers. The APA requires that the Commission allow an opportunity for notice and comment before promulgating rules other than those "of agency organiza-

---

**7.** Neighborhood also claims that the FCC failed to follow its own rules by applying proposed rules for low power television to Neighborhood's translator applications prior to the adoption of the final power television rules. Again this complaint focuses on the propriety of the FCC's applications of its rules to particular

translator applications, and is properly raised in a challenge to grants of licenses for which these applications competed. To the extent that Neighborhood's objection is that the FCC improperly *adopted new rules* governing translator applications during the interim period, that concern is addressed in Part II C *supra*.

tion, procedure, or practice," 5 U.S.C. § 553(b)[8]—so called "procedural" rules. The APA further requires that "substantive" rules shall be made public at least 30 days before their effective date. 5 U.S.C. § 553(d).[9] The FCC has maintained throughout the low power television rulemaking proceeding that its interim processing procedures are procedural rules, and therefore are not subject to the APA's notice and comment, or advance publication requirements. *See Memorandum Opinion and Order,* 84 F.C.C.2d at 726 (released Jan. 16, 1981); *Denial of Reconsideration,* 48 Fed.Reg. 21483 (May 12, 1983). Thus, the issue boils down to whether the interim processing procedure applied to translator applications during the interim period were procedural rules for purposes of the APA.

■ Courts have not had an easy time deciding whether particular agency rules were "procedural" or "substantive." *See Batterton v. Marshall,* 648 F.2d 694, 707 (D.C.Cir.1980) (procedural rule exception to APA's notice and comment requirement is hardest exception to define). " 'Procedure' and its opposite, 'substance,' are not talismanic labels or given premises. Rather, they are legal conclusions which depend upon their settings for definition." *Brown Express, Inc. v. United States,* 607 F.2d 695, 701 (5th Cir.1979). "A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton,* 648 F.2d at 707. *See also National Association of Home Health Agencies v.*

*Schweiker,* 690 F.2d 932, 949 (D.C.Cir. 1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983) (APA exemption from the notice and comment requirement does not apply to agency action which has a substantial impact on substantive rights and interests). It still remains, however, to identify the "substantive rights and interests" that may not be altered without prior opportunity for notice and comment. Certainly not every interest so qualifies, since every change in rules will have some effect on those regulated. *See Batterton,* 648 F.2d at 707. In determining whether a rule is substantive, we must look at its effect on those interests ultimately at stake in the agency proceeding. *See, e.g., Pickus v. United States Board of Parole,* 507 F.2d 1107 (D.C.Cir.1974) (parole board guidelines were substantive because they "were the kind calculated to have a substantial effect on the *ultimate* parole decisions") (emphasis supplied).

■ We believe the FCC did not violate the APA's notice and comment requirements with respect to the FCC decision to freeze all opposed translator applications, and to later reorder processing of applications according to a tiered, rather than first filed first processed system. Neighborhood's ultimate interest in the FCC proceedings was the grant of television translator licenses. The freeze and processing reorder decisions affected this interest only incidentally, first by delaying consideration of Neighborhood's applications and second by subjecting Neighborhood's applications to increased competition with qualified applicants.[10] Significantly, these decisions in no way limited or precluded Neighborhood

---

8. Section 553(b) provides in pertinent part:

General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.... Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice ....

9. Section 553(d) provides in pertinent part:

(d) The required publication or service of a substantive rule shall be made no less than 30 days before its effective date ....

10. The final low power television rules had already been adopted when the licenses were granted to Neighborhood's competitors, and Neighborhood makes no claims that the competing applications did not comply with FCC rules at the time of the grants. *See* Brief for Petitioner Neighborhood at 22–23.

from competing for translator licenses along with other qualified applicants.[11] On the other hand, the FCC had a strong interest in preparing for timely implementation of the low power television service, and in assuring that grants of traditional translator licenses would not interfere with the future institution of that service.

This court has previously held interim processing rules to be procedural, in cases involving almost identical interests to those raised in this case. *See Kessler v. FCC,* 326 F.2d 673 (D.C.Cir.1963) and *Ranger v. FCC,* 294 F.2d 240 (D.C.Cir.1961); *see also Buckeye Cablevision, Inc. v. United States,* 438 F.2d 948 (6th Cir.1971) (upholding processing freeze adopted without notice and comment as a procedural rule). Kessler challenged a partial freeze on the filing of applications for AM radio stations pending adoption of newly proposed rules. As in this case, the FCC continued to process filed applications, and the freeze was not universal—it exempted certain classes of applications which the FCC said posed no risk of "frustrat[ing] the ends [it sought] to achieve by [its] re-study [of radio broadcast rules]." *Kessler,* 326 F.2d at 681. We held that "[s]ince the interim criteria created no new station assignment standards but were, rather, primarily concerned with the effective function of Commission processes, the AM 'freeze' was pro-

cedural in nature and not subject to the formal rulemaking requirements of the Administrative Procedures Act." *Id.* at 681 (quoting FCC Memorandum Opinion and Order (released October 15, 1962)). In *Ranger,* the appellant challenged the FCC's initial adoption of the cut-off list approach to processing broadcast license applications. The appellant's application for a radio station was returned as deficient under FCC rules. Appellant was not allowed to refile the application because the cut-off date for a competing application had passed before the appellant's application was returned. This court rejected the appellant's attack that the cut-off list rule had been adopted without notice and comment, stating that while "all procedural requirements may and do occasionally affect substantive rights," in that case "no substantive rights were actually [directly] involved by the regulation itself." *Id.* at 244. *Kessler* and *Ranger* have already marked the terrain for assessing the interests in the case before us. In light of these two precedents, we conclude that the FCC's decisions to freeze translator applications opposed by mutually exclusive applications, and to modify its application processing order, were procedural rules.[12]

■ We are, however, less certain that the FCC's 15 station limit was a "procedur-

---

11. Neighborhood suggests that in one isolated instance, interim processing denied its right, under *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), to compete with a mutually exclusive applicant for a translator license. *See* Supplemental Brief for Petitioner Neighborhood at 13–14. This situation occurred, according to Neighborhood, because under technical standards in effect during the interim period, Neighborhood's application was not deemed mutually exclusive with that of the successful licensee. The licensee was thus unopposed and got a construction permit for the translator station during the interim period. According to Neighborhood, the technical rules actually adopted were different from those proposed, and under the final rules Neighborhood's application was mutually exclusive with the licensee's application. Thus, Neighborhood's application was dismissed on grounds it interfered with the licensee's facility. We do not believe this lone situation justifies invalidation of the FCC's interim procedures generally. To the ex-

tent that interim processing indirectly resulted in isolated denials of applicant's *Ashbacker* rights, the individual grants of licenses can be challenged on such grounds.

12. Neighborhood attempts to distinguish *Kessler's* holding that an FCC partial filing freeze is a "procedural" rule, arguing that *Kessler* involved a "danger that Commission compliance with existing rules would produce results inconsistent with a proposed new regulatory program." Brief for Petitioner Neighborhood at 42. This, however, is precisely the claim made by the FCC with respect to its low power television interim processing procedures. *See Memorandum and Opinion,* 84 F.C.C.2d at 726 (noting problems caused by licensing of translator stations that "turned out to violate adopted ... [low power television] prohibitions"). We treat Neighborhood's contention that this claim is not adequately supported in our review of the interim processing procedures in Part II D *supra.*

al" rule. Even if an application was unopposed, that limit was a direct bar to the applicant receiving a traditional translator license whenever the applicant already had 15 translator licenses. It thus directly affected the substantive ownership requirements for translator licenses. In this case, however, we need not decide if the 15 station limit was a substantive rather than a procedural rule, since Neighborhood never indicated how it was harmed by this rule. *See* note 5 *supra.* At argument, counsel for the FCC noted that Neighborhood did not file more than 15 applications that were not mutually exclusive with other applications. Hence, the vast bulk of Neighborhood's applications were "frozen" anyway under a different provision of the interim rules. In fact, the FCC's counsel stated in court that its failure to process Neighborhood's applications had nothing to do with the 15 station limit, and Neighborhood has proffered no evidence to indicate otherwise. Thus, on the record before us we have nothing to indicate that Neighborhood was adversely affected by the 15 application limit so as to qualify it to complain about that criterion before this court.

### D. *Interim Processing As Reasoned Decisionmaking*

■■■ Neighborhood asserts as its final ground for attacking the FCC's interim processing procedures, that the adoption of these procedures was arbitrary and capricious. We note that, "[t]he scope of review under 'the arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of an agency." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). Nevertheless, a reviewing court's task is not merely to rubber-stamp an agency decision; it is to ensure that the agency took a "hard look" at all relevant issues and considered reasonable alternatives to its decided course of action. *See Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2866–67 (agency must consider reasonable alternatives); *Telocator Network v. FCC,* 691 F.2d 525,

545 (D.C.Cir.1982) (agency must consider all relevant factors); *Action for Children's Television v. FCC,* 564 F.2d 458, 478–79 (D.C.Cir.1977) (agency must give relevant factors a "hard look"). In short, the key to the arbitrary and capricious standard is its requirement of reasoned decisionmaking: we will uphold the Commission's decision if, but only if, we can discern a reasoned path from the facts and considerations before the Commission to the decision it reached.

Neighborhood claims "[t]he Commission's justification for extending 'interim processing' to translators was ... threadbare," because the Commission failed even then to acknowledge that this extension was a departure from existing practice, or to explain adequately its reasons for the extension. *See* Brief for Petitioner Neighborhood at 46. To the contrary, we believe the FCC clearly explained that adoption of interim procedures prior to authorization of this new major broadcasting service was consistent with its past practice of adopting such procedures to ensure that during a pending comprehensive rulemaking interim licensing did not frustrate the ends of the rules ultimately adopted. *See Memorandum and Opinion and Order,* 84 F.C.C.2d at 727. The FCC's rationale for the particular interim processing decisions here was that they were specifically designed to protect against precipitous and potentially overwhelming encroachment by translator applicants on the aerial territory of any low power television service system the Commission ultimately adopted. *Id.* at 723–24.

The FCC decision to condition all interim grants on the final low power television rules is amply explained by the historical development of low power television. From the Commission's first notice of inquiry, it viewed low power television as growing out of, and as a natural extension of, the translator service. *See Notice of Inquiry,* 68 F.C.C.2d at 1525–27. Thus there was little question that if adopted the low power television service would include within it traditional translator stations, and that a single set of low power television

regulations would govern both originating and traditional translator licenses. For this reason, the FCC recognized that unless it conditioned interim grants of translator licenses on final low power television rules, it would have to grandfather nonconforming licensees who received interim grants if and when the new low power television service was adopted. The Commission explained:

> It is not sound policy to initiate a service into which nonconforming operators are grandfathered when we can prevent this result easily. This view is supported amply by closely similar situations that we have resolved the same way in the past.

*Memorandum Opinion and Order,* 84 F.C.C.2d at 727 (citation omitted). The FCC further pointed out that divestiture of licensees, the alternative to grandfathering, could cause "disruptions to and withdrawal of existing service." *Id.* at 726. The decision to condition interim translator grants on final low power television rules was thus adequately reasoned.

The FCC decision to freeze processing of *all* mutually exclusive applicants—traditional translators and those requesting waiver of the no origination rule alike—was also sufficiently explained. In addition to its primary effect of keeping channels clear for low power television stations once the service was authorized, the FCC also relied on the freeze to alleviate any potential for applicants to grab stations during the interim period with a stated intention of operating a traditional translator station, but with the real intention of upgrading them to low power television stations after the low power service was authorized. The Commission explained:

> If we elected to process only conventional translator applications, and no waiver requests, in the interim, we virtually would be inviting abuse of the authorization process. Applicants whose underly-

ing motive was to establish low power services would continue to file for conventional translators in the interim, intending to upgrade later.

*Id.* at 724.

Neighborhood points to another safeguard against this secret upgrade tactic which, it claims, renders superfluous the Commission's decision to subject traditional translator applications to competition with applications asking for program origination authority. *See* Brief for Petitioner Neighborhood at 46. The safeguard to which Neighborhood refers is the Commission's practice which treats the upgrading of a translator station as a major modification in the translator's license, thereby subjecting the translator to petitions to deny the upgrade and to informal objections. *See Memorandum Opinion and Order,* 84 F.C.C.2d at 734. Neighborhood fails to recognize, however, that if a translator applicant could use this secret upgrade tactic, the applicant would still avoid having to compete with other lower power applicants to obtain its broadcast frequency. This is so because even though petitions to deny the modification could result in the applicant not being authorized to use the frequency to originate programming, such petitions would not challenge the applicant's existing authority to use the frequency, thereby shutting off competition from low power television applicants.[13]

By refusing to process traditional translator applications as mutually exclusive with applications that requested waivers of the no origination rule, the Commission precluded interim translator grants which might have resulted in later attempts to upgrade, thereby unfairly preventing other low power television applicants from seeking the same channels. We are convinced this rationale is a sufficiently reasonable one to pass judicial muster.[14]

---

**13.** In addition, the Commission feared that applicants might apply for interim grants with the intention of broadcasting unauthorized original programs, a practice which the FCC could not easily detect. *See Memorandum Order and Opinion,* 84 F.C.C.2d at 724 n. 9. The FCC's

upgrade procedures would, of course, have no effect on this practice. Neighborhood entirely ignores this rationale of the FCC.

**14.** Neighborhood never attacked the FCC's decision to institute a tiered system for ordering processing of low power television applications

### III. THE SHERIFF'S CLAIM

 The Sheriff takes issue with the FCC's "secondary" grant of authority for low power television stations to operate on UHF television channels 14–20. His concern focuses on the possibility of conflicting demands for spectrum space by low power television stations and users of the private land mobile radio service. This radio service authorizes radio communications between mobile transmitters and receivers and land base stations. Public safety agencies such as police and fire departments, and emergency medical services use private land mobile radio extensively to meet their communication needs.

In 1970, in order to relieve congestion and increase the availability of frequencies for public safety radio communications, the Commission provided for the "sharing" of channels 14–20 in certain designated metropolitan areas (including Los Angeles) between television broadcast services and the land mobile radio service.[15] *See In the Matter of Geographic Reallocation of UHF–TV Channels 14 Through 20 to the Land Mobile Radio Services for Use Within the 25 Largest Urbanized Areas of the United States*, 23 F.C.C.2d 325, 337 (1970). In its proposed low power television rule, however, the FCC announced its intention to permit low power television licensees to select any channel from 14–69. Four months later, in response, the Sheriff filed comments stating that "[t]he potential for harmful interference [with public safety communications on channels 14–20] will certainly increase as additional TV stations are licensed." Comments of the Sheriff at 4, *reprinted in* J.A. at 76. The Sheriff suggested that the FCC restrict low power television authorization to channels above 20, at least until the Commission "undertake[s] a study of total communications needs throughout the country *for all* spectrum users and develop[s] an equitable allocation of spectrum for *all* of the users." *Id.* (emphasis in original). In August, 1981, while the low power television rulemaking was still pending, the Sheriff filed a separate petition requesting the Commission to reallocate UHF channels 14–20 on a nationwide basis exclusively to private land mobile radio services.

In adopting its final rule, the Commission recognized that its action authorizing low power television on channels 14–20 "could have a negative impact upon the possibility of favorable outcome of the Sheriff's petition for reallocation of channels 14–20." *Report and Order*, 47 Fed.Reg. 21,479 (1982). It further stated that "the mutual accommodation of the Sheriff's petition and low power TV seems to be ... difficult, if not impossible." *Id.* at 21,480. The Commission did not address the merits of the Sheriff's petition, however, for it concluded:

> due to the strong public support and demand for low power TV, we do not consider it to be in the public interest to delay this proceeding to review ... [the Sheriff's petition] particularly because the Commission has not yet even determined whether petitioners have made a threshold showing warranting rulemak-

explicitly on the ground it was arbitrary and capricious. Clearly, such an attack could not prevail. The FCC instituted the tiered system in response to the deluge of low power television and translator applications it received. It explained that the system served the dual functions of reducing the costs of determining processing order (by eliminating the need for an engineering determination) and of getting low power and translator stations to rural areas, where they are needed most. The Supreme Court has previously noted that "[u]nderlying the whole [Communications Act] is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to ad-

just itself to those factors." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). Certainly the unexpected volume of low power television applications gave rise to the need for this flexible administrative process, and the FCC acted reasonably in trying to make the best of a difficult situation.

**15.** In 1970, the FCC also allocated UHF television channels 70–83 exclusively to the land mobile radio service. *See National Assoc. of Regulatory Utility Comm. v. FCC*, 525 F.2d 630 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

ing. After further analysis has been completed, these petitions will be accommodated through separate proceedings and to the extent the Commission determines appropriate.

*Id.*

The issue thus raised is whether the FCC acted reasonably and consistently with the public interest in allocating channels 14–20 to low power television while deferring consideration of the land mobile radio service's need for spectrum space until it considered the Sheriff's rulemaking petition. We have previously recognized the Commission's discretion to defer resolution of issues raised in a rulemaking so long as the issues decided are not "inextricably related to the issues deferred." *ITT World Communications, Inc. v. FCC*, 725 F.2d 732, 754 (D.C. Cir.1984); *see also National Association of Broadcasters v. FCC*, 740 F.2d 1190, 1210 (D.C.Cir.1984) [hereinafter cited as *NAB*]; *Western Union International, Inc. v. F.C.C.*, 673 F.2d 539, 543 (D.C.Cir.1982). To deny the Commission this flexibility would paralyze it where its actions were taken "against a shifting background in which facts, predictions and policies are in flux." *NAB* at 1210. The Commission, however, may not abuse this flexibility by failing to consider, in a rulemaking, an issue whose resolution might seriously undercut the Commission's rationale for its final action in that rulemaking. *See NAB* at 1210; *ITT World Communications*, 725 F.2d at 754.

The test of whether the Commission acted permissibly in deferring consideration of an issue raised in a rulemaking proceeding is thus pragmatic so as to ensure reasoned decisionmaking while allowing the Commis-

sion to cope with rapidly changing circumstances:

[P]ostponement will be most easily justified when an agency acts against a background of rapid technical and social change and when the agency's initial decision as a practical matter is reversible should the future proceedings yield drastically unexpected results. In contrast, an incremental approach to agency decision making is least justified when small errors in predictive judgments can have catastrophic effects on the public welfare or when future proceedings are likely to be systematically defective in taking into account certain relevant interests.

*NAB* at 1211.

In this case there is an additional factor which enters the calculus of deferral. The Sheriff points out that in the 1982 Amendments to the Communications Act, Congress showed great solicitude for public safety broadcaster's needs.[16] *See* Brief for Petitioner Sheriff at 27. In addition, 1983 appropriations legislation for the ICC specifically directs "the Commission to establish a plan which adequately ensures that the needs of State and local public safety authorities would be taken into account in making allocations of the electromagnetic spectrum." Pub.L. No. 98–214, 97 Stat. 1467 (1983). In explaining that amendment the House Committee stated that "public safety considerations should be a top priority when frequency allocation decisions are made." H.R.Rep. No. 356, 98th Cong., 1st Sess. 21 (1983), U.S.Code Cong. & Admin. News 1983, pp. 2219, 2237. Thus, if the FCC's allocation of channels to low power television was inconsistent with these amendments, we must remand for the FCC

---

**16.** 47 U.S.C. § 332(a) provides: "[i]n taking actions to manage the spectrum to be made available for use by the private land mobile services, the Commission shall consider ... whether such actions will (1) promote the safety of life and property ...." The Conference Report, addressing this section, further stated:

The Commission should be ever vigilant to promote the private land mobile spectrum needs of police departments and other public agencies which need to use such radio servic-

es to fulfill adequately their obligations to protect the American public. The Conferees are particularly concerned about radio services which are necessary for the safety of life and property and urges the Commission to carefully consider the legitimate needs of public safety agencies in managing the private land mobile spectrum.

H.R. No. 765, 97th Cong., 2d Sess. 52–53 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2237, 2296–2297.

to reconsider its decision.[17] *See NAB* at 1213.

Applying the factors we have enumerated to this case, we believe the FCC acted permissibly in deferring consideration of mobile land radio broadcasters' needs. Judging from the large numbers of applications the FCC received, it was acting against a background of rapidly increasing demand for low power television. The Commission was thus justified in treating the expedition of low power television's authorization as an important goal. In addition, the FCC explained it had reason to believe that possible legal and technology developments might alleviate the seeming tension between the spectrum needs of low power television and land mobile radio broadcasters. *See Final Rule,* 47 Fed. Reg. 21479 (1982) ("1979 World Administrative Radio Conference [awaiting U.S. Senate ratification] recognized the potential for shared Land Mobile/Broadcast use of frequencies between 512 and 806 MHz ([UHF] T.V. channels 21 through 69)"); *Denial of Reconsideration,* 48 Fed.Reg. 21480 (*Interim Report on Future Private Land Mobile Telecommunications Requirements* noted that new technologies exist that may alleviate spectrum scarcity). The Commission also ensured that its decision was reversible by putting low power television licensees on notice that their use of channels 14–20 may be preempted by the FCC's subsequent action in the Sheriff's rulemaking petition. Finally, the Commission did not run afoul of the congressional mandate that it give public safety agency use of the spectrum top priority since it ordered: "to the extent that interference [with full service television stations and land mobile radio communication] does result, low power stations are being authoriz-

ed on a secondary basis ... and must both correct whatever interference they cause or cease operations and accept whatever interference they receive...." *Final Rule,* 47 Fed.Reg. 21479 (1982).

In *NAB,* as here, we upheld the Commission's discretion to defer comprehensive consideration of public safety agencies spectrum needs when it authorized the direct broadcast satellite service (DBS). NAB at 1213–14. There we relied on "Commission represent[ations] to this court that '[i]t would be unthinkable for the Commission to allow DBS to threaten the vital public safety radio services presently produced' on the 12GHz band [the band allocated to the new service]." *Id.* at 1214 (citing the FCC brief in NAB). Here we take the FCC's relegation of low power television to secondary status as a similar indication that the "Commission has stated its commitment to fulfill [its] acknowledged duty [to guarantee the integrity of safety and emergency radio services]." *Id.* Therefore, for the same reasons as we rejected the Sheriff's petition for review in *NAB,*[18] we reject his petition in this case.

### CONCLUSION

We have considered all of Neighborhood's claims, including those we have not explicitly addressed in this opinion, and find all to be without merit. Essentially Neighborhood complains that the FCC's interim procedures required it to compete with qualified low power television applicants with which it would not otherwise have to compete. It thereby failed in its bid to establish an alternative nationwide television network using translators and satellite interconnects. While we do not doubt that the interim procedures helped frustrate Neighborhood's plans to establish

---

**17.** Although both of these Acts were passed after adoption of the low power television rules, they might still have a bearing on the FCC rulemaking action. As we recently stated

in light of the fact that these amendments were conceived of as merely articulating the meaning already present in Section 151 [of the Federal Communications Act], the amending Congress[es] may have intended that they

be applied to agency decisions still pending for judicial review on the date of enactment. *NAB* at 1213. There is no need to decide, in this case, whether Congress so intended, since we believe that the FCC gave adequate priority to public safety broadcasting.

**18.** In *NAB,* as here, the Los Angeles County Sheriff's Department petitioned for review of the spectrum allocation.

its television network, Neighborhood was not substantially denied any opportunity to compete for a license with other qualified applicants. The FCC, faced with the difficult task of implementing a new major broadcasting service, acted within its authority in promulgating procedural rules aiming to bring that service into being in an orderly, fair, and timely manner. We thus affirm the FCC's adoption of its interim processing procedures to govern translator applications prior to adoption of final low power television rules.

We have also considered all the Sheriff's claims and have concluded that they are not meritorious. While we agree that the Commission has an obligation to assure that new services it authorizes do not interfere with public safety agencies' use of radio communications, we believe that the FCC tailored its order to give this assurance.

*Affirmed.*